ORDERED.

Dated:  **March 30, 2020**

Michael G. Williamson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                                          Case No. 8:17-bk-04591-MGW
                                                                                     Chapter 7
Donald Woodrow Smith,

      Debtor.
_____/

Webster Business Credit Corporation                    Adv. No. 8:17-bk-ap-720-MGW

      Plaintiff,

v.

Donald Woodrow Smith,

      Defendant.
_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In 1902, Rudyard Kipling published one of his most famous works: *Just So*

*Stories*, a compilation of fanciful tales explaining how various animal features came

to be—e.g., how the camel got its hump, how the leopard got its spots, etc.[1] Over time, the phrase "just-so story" has come to mean an unverifiable narrative explanation for (among other things) human behavior.[2] This case involves Don Smith's just-so story to explain what happened to nearly $5 million in missing jewelry.

Over the course of six years, a jewelry store Smith owned, Continental Jewelry, borrowed nearly $5 million on a line of credit from Webster Business Credit Corporation. To induce Webster to extend credit over the years, Smith signed hundreds of borrowing base certificates and other collateral reports certifying that Continental owned (depending on the time frame) anywhere from $4 million to $6.7 million in inventory, which served as collateral for the line of credit. But, after Continental eventually filed an assignment for the benefit of creditors, it was discovered that Continental's inventory was only around $1.6 million—nearly $5 million less than represented in the last borrowing base Continental had submitted.

To explain the $5 million in missing jewelry, Smith put on evidence at trial that Continental's revenues averaged more than $5 million; it could not have generated $5 million in revenue on $1.6 million in inventory; the loss of inventory was an abrupt event; the person who conducted the $1.6 million inventory had previously been accused of fraud; and some former employees supposedly opened up

---

[1] https://www.britannica.com/topic/Just-So-Stories.

[2] https://en.wikipedia.org/wiki/Just-so_story.

another jewelry store after Continental closed. From that evidence, the Court is supposed to infer that the person who conducted the inventory, or perhaps a former employee, stole the $5 million inventory.

But just-so stories aren't necessary when there's a verifiable explanation. Here the overwhelming evidence at trial explained what happened to the missing jewelry: As Continental's revenues plummeted with the onset of the Great Recession, Smith had to find a way increase his borrowing base in order to supplement his cash flow. So he directed Continental employees to enter consigned jewelry into the company's inventory system as owned, which allowed Continental to increase its borrowing base. Shortly before Continental filed the assignment for benefit of creditors, Continental's vendors removed their jewelry, leaving the jewelry store barren. But, as was often the case, Smith directed employees not to remove inventory from the system after it was sold or returned. In the end, roughly three quarters of Continental's inventory either didn't exist or was consigned—not owned.

By intentionally submitting borrowing base certificates with falsely inflated inventory, Smith fraudulently induced Webster into extending $5 million in credit to Continental. Therefore, Smith is liable to Webster for fraudulent misrepresentation, and that debt is nondischargeable under Bankruptcy Code § 523(a)(2)(B).

## I.   FINDINGS OF FACT

### A.   Continental operated a retail jewelry store.

More than 30 years ago, Don Smith, along with his brother, founded Continental Diamond Cutting Company, an upper-end retail jewelry store that did

business as Continental Jewelry.[3] Continental had four locations: three satellite locations where the company primarily serviced insurance claims for lost or stolen jewelry, and its main location in Tampa, which served as the company's headquarters, as well as a showroom for the company's loose diamonds and fine jewelry inventory.[4]

### B.   Historically, Continental carried a small amount of consigned jewelry.

Jewelry stores like Continental typically carry consigned jewelry when a customer is looking for an item the store doesn't ordinarily carry or to augment the store's inventory during certain times of the year, such as Valentine's Day or Mother's Day.[5] As of March 2005, Continental reported that it only carried around $323,000 of consigned inventory—which made up less than 10% of its total inventory.[6]

---

[3] Ex. 7, Adv. Doc. No. 59-7, at 4; Trial Tr. Vol IV, Adv. Doc. No. 127, p. 626, ll. 19 – 25.

[4] Ex. 7, Adv. Doc. No. 59-7, at 4; Ex. 27 at Adv. Doc. No. 60-3, at 7.

[5] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 43, ll. 9 – p. 44, l. 5; p. 95, ll. 10 – 14.

[6] Ex. 7, Adv. Doc. No. 59-7, at 9; Continental also took jewelry in "on memo." Trial Tr. Vol I, Adv. Doc. No. 115, at p. 140, l. 15 – p. 141, l. 7. For our purposes, consignment and "memo" were basically the same. Trial Tr. Vol I, Adv. Doc. No. 115, at p. 140, l. 15 – p. 141, l. 7. In either case, the vendor can take the item back. Trial Tr. Vol I, Adv. Doc. No. 115, at p. 140, l. 15 – p. 141, l. 7.

### C.    Continental obtained asset-based financing from Webster.

In April 2005, Continental entered into a $5 million line of credit with Webster Business Credit Corporation.[7] The line of credit was secured by a lien on (among other things) Continental's receivables and inventory. Because the line of credit was an asset-based loan, the amount Continental could borrow at any given time depended on its "borrowing base."[8] Under the parties' loan agreement, Webster agreed to lend against 85% of Continental's eligible trade accounts receivable plus 65% of its eligible inventory.[9]

Although "eligible inventory" was defined as loose diamonds and first-quality finished goods held for sale in the ordinary course of business, the parties' loan agreement specifically excluded an item from "eligible inventory" if Continental did not have good, valid, and marketable title to the item.[10] Because Continental did not, by definition, hold title to jewelry brought in on consignment, consigned jewelry was excluded from Continental's "eligible inventory."[11]

---

[7] Ex. 38, Adv. No. 61-5; Trial Tr. Vol I, Adv. Doc. No. 115, at p. 35, ll. 1 – 24; Trial Tr. Vol IV, Adv. Doc. No. 127, p. 627, ll. 4 – 11.

[8] Ex. 38, Adv. Doc. No. 61-5, at §§ 2.1(a) & 4.1; Trial Tr. Vol I, Adv. Doc. No. 115, at p. 36, l. 3 – p. 37, l. 3; p. 38, l. 3 – p. 39, l. 2.

[9] Ex. 38, Adv. Doc. No. 61-5, at § 2.1(a).

[10] Ex. 38, Adv. Doc. No. 61-5, at § 1.1.

[11] Ex. 38, Adv. Doc. No. 61-5, at § 1.1; Trial Tr. Vol I, Adv. Doc. No. 115, at p. 41, l. 17 – p. 43, l. 11.

**D.    Continental was required to certify its borrowing base to Webster.**

Each time Continental wanted to borrow against the line of credit, it was required to submit a borrowing base certificate, which was used to certify Continental's borrowing base.[12] The parties' loan agreement also required Continental to (among other things) submit a borrowing base certificate to Webster on a weekly basis so that Webster could monitor Continental's inventory.[13]

To complete the borrowing base certificate, whether as part of requesting an advance or as part of satisfying its weekly reporting obligations, Continental would first report the cost value of its total inventory and then subtract from the total inventory certain "ineligibles," including consigned jewelry, to arrive at the "eligible inventory."[14] Continental would also report its receivables on the borrowing base certificate. Continental would then apply the advance rate to its eligible inventory and receivables (65% for inventory and 85% for receivables) to determine its borrowing base.[15]

Since Continental's borrowing base determined the amount Continental could borrow, each borrowing base certificate required Continental to represent and warrant that the information in the borrowing base certificate—i.e., the amount of

---

[12] Ex. 38, Adv. Doc. No. 61-5, at § 2.1.

[13] Ex. 38, Adv. Doc. No. 61-5, at § 6.2; Trial Tr. Vol I, Adv. Doc. No. 115, at p. 40, ll. 21 – 25.

[14] Ex. 50, Adv. Doc. No. 61-17; Trial Tr. Vol I, Adv. Doc. No. 115, at p. 41, l. 20 – p. 43, l. 11.

[15] Ex. 50, Adv. Doc. No. 61-17; Trial Tr. Vol I, Adv. Doc. No. 115, at p. 44, ll. 10 – 25.

eligible inventory and receivables—was true.[16] Webster would rely on the borrowing base certificates—and the representations in them—in deciding whether to advance credit to Continental.[17]

### E.    The information for the borrowing base certificates came from Syntonics.

All Continental's inventory was maintained in Syntonics, an inventory management system specially designed for jewelers.[18] When Continental received inventory, Continental employees would open the item and make sure it matched the invoice before passing it along to Smith.[19] Smith would then return the item to the Continental employees with the suggested retail price and specific instructions on how to enter the item into Syntonics (i.e., owned or consigned).[20]

The Continental employees would enter the item into Syntonics however Smith told them to.[21] When an item was entered as consigned, it was designated under a separate status code so that it could be differentiated from owned jewelry

---

[16] Ex. 50, Adv. Doc. No. 61-17.

[17] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 58, ll. 9 – 15.

[18] Trial Tr. Vol II, Adv. Doc. 120, at p. 463, ll. 4 – 12; Trial Tr. Vol III, Adv. Doc. No. 121, at p. 513, ll. 20 – 24; Trial Tr. Vol IV, Adv. Doc. No. 127, at p. 637, ll. 10 – 20; p. 673, l. 25 – p. 674, l. 2; p. 788, l. 11 – p. 789, l. 3.

[19] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 463, l. 15 – p. 464, l. 11.

[20] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 463, l. 15 – p. 464, l. 11; Trial Tr. Vol I, Adv. Doc. No. 115, at p. 163, ll. 3 – 24.

[21] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 163, ll. 3 – 24.

within Syntonics, though the jewelry tag would not indicate the item was

consigned.[22]

### F.    Smith was responsible for submitting the borrowing base certificates.

Ordinarily, Susan Keller would prepare the borrowing base certificates using

the Syntonics inventory report.[23] Before sending the borrowing base certificate to

Webster, Keller would have Smith review and sign it.[24] She always showed the

borrowing base certificates to Smith, who reviewed them every day.[25] If Smith wasn't

in the building, Keller would e-mail the certificate to Smith.[26] And, if Smith wasn't

available by e-mail, Keller would call him.[27] On those occasions when Smith wasn't

physically in the building, Keller would sign the borrowing base certificate for Smith.

But Keller never prepared a borrowing base certificate without Smith's oversight—

and she never signed one without Smith's approval.[28]

---

[22] Ex. 7, Adv. Doc. No. 59-7, at 9; Trial Tr. Vol I, Adv. Doc. No. 115, at p. 141, l. 21 – p. 142, l. 25.

[23] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 37, ll. 15 – 24; p. 41, l. 10 – p. 47, l. 25; Trial Tr. Vol II, Adv. Doc. No. 120, at p. 464, ll. 13 – 20.

[24] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 464, l. 13 – p. 465, l. 12; p. 468, l. 19 – 469, l. 22.

[25] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 464, l. 13 – p. 465, l. 12; p. 468, l. 19 – 469, l. 22.

[26] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 464, l. 13 – p. 465, l. 12; p. 468, l. 19 – 469, l. 22.

[27] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 464, l. 13 – p. 465, l. 12; p. 468, l. 19 – 469, l. 22.

[28] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 464, l. 13 – p. 465, l. 12; p. 468, l. 19 – 469, l. 22; p. 479, ll. 16 – 25.

### G.    Over time, Continental's business declined by more than one-third.

For the first two years or so after entering into the revolving line of credit with Webster, Continental's business remained relatively flat.[29] Beginning in late 2007, however, Continental's business began to struggle.[30] By the end of 2008, when the Great Recession was in full swing, Continental's revenues had dropped by nearly $2 million (a 20% decrease), while its gross profit had fallen by more than $1 million (a 30% decrease).[31] By the end of 2010, revenues were down another $1.3 million and gross profit was down another $300,000.[32] In all, from 2005 to 2010, Continental's revenues declined nearly 35%.[33]

### H.    Continental's declining business put the company in a Catch-22.

As sales and revenues decreased, Continental was forced to borrow against its line of credit to supplement its cash flow.[34] But there were times when the company

---

[29] Ex. 91, Adv. Doc. No. 62-1.

[30] Ex. 91, Adv. Doc. No. 62-1; Trial Tr. Vol I, Adv. Doc. No. 115, at p. 65, ll. 2 – 6.

[31] Ex. 91, Adv. Doc. No. 62-1; Trial Tr. Vol I, Adv. Doc. No. 115, at p. 113, ll. 11 – 22.

[32] Ex. 91, Adv. Doc. No. 62-1; Trial Tr. Vol I, Adv. Doc. No. 115, at p. 113, ll. 11 – 22.

[33] Ex. 91, Adv. Doc. No. 62-1.

[34] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 113, l. 18 – p. 114, l. 25.

had reached its borrowing capacity.[35] The only way for Continental to increase its

borrowing capacity was to increase its inventory or accounts receivable.[36]

From time to time, Smith told Keller he was going to buy inventory to do just

that—increase the availability on the line of credit.[37] But Continental's lack of cash

was making it difficult for the company to get inventory.[38] Smith was robbing Peter to

pay Paul.[39] He was willing to do whatever he could to keep his company going.[40]

I.      **To inflate its borrowing base, Smith had employees enter
        consigned jewelry into Syntonics as owned 70-80% of the
        time.**

Over time, Continental began turning more and more to consigned

inventory.[41] In particular, Continental looked to Buxbaum Jewelry and Silverman,

among others, to augment its inventory.[42] But rather than having the jewelry from

Buxbaum and others entered into Syntonics as consigned, Smith would have the

---

[35] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 472, l. 19 – p. 473, l. 10.

[36] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 47, ll. 3 – 8; Trial Tr. Vol II, Adv. Doc. No. 120, at p. 472, l. 19 – p. 473, l. 10.

[37] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 473, l. 19 – p. 474, l. 9.

[38] Trial Tr. Vol III, Adv. Doc. No. 121, at p. 550, ll. 4 – 17; Trial Tr. Vol I, Adv. Doc. No. 115, at p. 132, l. 19 – p. 133, l. 8.

[39] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 179, ll. 1 – 3.

[40] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 175, l. 22 – p. 176, l. 2.

[41] Ex. 33; Trial Tr. Vol III, Adv. Doc. No. 121, at p. 550, l. 12 – p. 551, l. 19.

[42] Trial Tr. Vol III, Adv. Doc. No. 121, at p. 550, l. 12 – p. 552, l. 11; Trial Tr. Vol I, Adv. Doc. No. 115, at p. 217, ll. 10 – 13.

jewelry entered into Syntonics as owned.[43] According to Shannon Macintyre, who worked in Continental's inventory division, Smith would direct her to enter consigned jewelry into the system as owned roughly 70% to 80% of the time.[44]

Although, at first, Macintyre didn't realize why, she soon came to understand: If an item came in on consignment, it would have no effect on Continental's ability to borrow.[45] But, if that same item was entered into Syntonics as owned, Continental's borrowing base would increase, allowing Continental to borrow against its line of credit.[46] Employees began suspecting that Smith was having consigned jewelry entered into Syntonics as owned to increase the company's borrowing base.[47]

### J.   Smith maintained his inventory by refusing to remove returned items from Syntonics.

When consigned items were returned to the vendor, they should have been removed from Syntonics.[48] The same is true, of course, when items were sold. But a dramatic decrease in Continental's inventory would have basically ruined the

---

[43] Trial Tr. Vol III, Adv. Doc. No. 121, at p. 550, l. 12 – p. 552, l. 11.

[44] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 163, ll. 3 – 24. At least one other employee testified Smith considered everything that came in to be owned, including jewelry that came in "on memo." Trial Tr. Vol III, Adv. Doc. No. 121, at p. 542, ll. 11 – 22.

[45] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 165, l. 15 – p. 166, l. 17.

[46] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 165, l. 15 – p. 166, l. 17.

[47] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 131, l. 17 – p. 132, l. 9.

[48] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 155, ll. 13 – 25.

company.[49] So, after items were returned to vendors or sold, Smith would often direct Continental employees to leave the inventory in Syntonics.[50] Employees knew not to remove an item from Syntonics unless Smith directed them to do so.[51]

### K.    To borrow against the line of credit, Smith submitted false borrowing base certificates.

From 2005 to 2011, Continental submitted hundreds of collateral reports—whether borrowing base certificates or inventory certificates—certifying its inventory (and receivables) level to Webster.[52] Over that time, Continental represented in those reports that its inventory had increased from roughly $4 million to just over $6.6 million.[53] The last borrowing base certificate Continental submitted to Webster represented that Continental's eligible inventory—i.e., total inventory less ineligibles such as consigned inventory—was $6,634,748.[54]

Even though the borrowing base certificates—not to mention the parties' loan agreement—specifically required Continental to exclude the consigned jewelry, the "eligible inventory" reported on the borrowing base certificates, in fact, included the consigned jewelry that Smith had directed employees to enter into Syntonics as

---

[49] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 474, ll. 10 – 15.

[50] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 155, l. 13 – p. 156, l. 22; Trial Tr. Vol III, Adv. Doc. No. 121, at p. 542, l. 11 – p. 544, l. 25; p. 550, l. 18 – p. 554, l. 7.

[51] Trial Tr. Vol III, Adv. Doc. No. 121, at p. 542, l. 11 – p. 544, l. 25; p. 553, l. 10 – p. 554, l. 7.

[52] Exs. 49 – 80 & 82 – 90, Adv. Doc. Nos. 61-16 – 61-47 & 61-49 – 61-57.

[53] Exs. 49 – 80, Adv. Doc. Nos. 61-16 – 61-47

[54] Ex. 80, Adv. Doc. No. 47.

owned.[55] The "eligible inventory" also included jewelry that had been returned to vendors or sold but not removed from Syntonics.[56] The fact is, as Webster would soon find out, Continental had nowhere near $6.6 million in eligible inventory.

### L.    At the time, no one discovered Smith's fraudulent scheme.

Over the years, various third parties monitored Continental's collateral. First there was ARG Recovery, LLC, an inventory appraisal company.[57] ARG Recovery, which conducted site visits three times a year, was tasked with determining the market value of Webster's collateral (i.e., Continental's inventory) in the event of an orderly liquidation.[58] Rather than conduct its own inventory, ARG Recovery relied on the stock ledger report from Syntonics.[59] When it came to reviewing inventory, ARG was more concerned with walking through the store to get a feel for how the inventory was displayed and to get a sense of its ability to drive traffic in a liquidation sale scenario.[60]

---

[55] Trial Tr. Vol III, Adv. Doc. No. 121, at p. 542, ll. 11 – 22; p. 550, l. 12 – p. 552, l. 11; Trial Tr. Vol I, Adv. Doc. No. 115, at p. 163, ll. 3 – 24; p. 217, ll. 10 – 13.

[56] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 155, l. 13 – p. 156, l. 22; Trial Tr. Vol III, Adv. Doc. No. 121, at p. 542, l. 11 – p. 544, l. 25; p. 550, l. 18 – p. 554, l. 7.

[57] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 53, l. 24 – p. 54, l. 2.

[58] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 53, l. 24 – p. 54, l. 12; Exs. 13 – 27, Adv. Doc. No. 59-13 – 60-3.

[59] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 54, l.13 – p. 55, l. 1.

[60] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 54, l.13 – p. 55, l. 1.

Then there was Spain Price Reader & Thompson, which was a field examiner.[61] As a field examiner, Spain Price conducted three field exams a year to test Continental's operations and its collateral reporting.[62] Like ARG Recovery, Spain Price did not conduct a full inventory.[63] Instead, Spain Price, like ARG Recovery, primarily relied on information it got from Continental, though Spain Price would spot check ten to twenty (out of thousands of) inventory items.[64]

Finally, there was B2D Semago, which was Continental's CPA.[65] A team of three or four employees from B2D Semago observed part of Continental's year-end inventory.[66] But, like ARG Recovery and Spain Price, B2D Semago did not conduct its own inventory, instead opting for test counts like Spain Price.[67] Linda Churchill, a CPA at B2D Semago, would come in toward the end and pick out twenty or so pieces for Continental employees to locate.[68]

---

[61] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 51, ll. 13 – 15.

[62] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 51, l. 19 – p. 52, l. 9; Exs. 7 – 12, Adv. Doc. Nos. 59-7 – 59-12.

[63] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 52, l. 10 – p. 53, l. 2.

[64] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 52, l. 10 – p. 53, l. 2.

[65] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 56, ll. 6 – 18; Trial Tr. Vol III, Adv. Doc. No. 121, at p. 576, ll. 3 – 22.

[66] Trial Tr. Vol III, Adv. Doc. No. 121, at p. 576, l. 4 – p. 577, l. 20.

[67] Trial Tr. Vol III, Adv. Doc. No. 121, at p. 595, l. 15 – p. 577, l. 20.

[68] Trial Tr. Vol. I, Adv. Doc. No. 115, at p. 146, l. 7 – p. 147, l. 9; Trial Tr. Vol III, Adv. Doc. No. 121, at p. 577, l. 21 – p. 585, l. 8.

Of the three, only Spain Price ever raised an issue about consigned jewelry being included in Continental's inventory. As early as May 2010, Spain Price noted that, as part of reviewing a selection of invoices, it discovered that some vendors had submitted invoices to Continental with consignment language.[69] The report went on to note, however, that (according to Continental's management) those transactions were situations where merchandise was delivered to Continental on COD or where Continental paid for the merchandise with postdated checks.[70]

### M.   As Continental is on verge of going out of business, Smith has inventory documents shredded.

By mid-2011, Continental was still performing poorly.[71] Webster was looking to find ways to start getting the loan paid down.[72] Meanwhile, Continental was having discussions with a consultant who could help the company with its performance issues.[73] By the end of August 2011, however, Smith was no longer interested in doing anything with the loan: He basically said, "I'm done."[74]

Shortly before telling Webster that he was done, Smith was seen giving Continental's jewelry polisher, a gentleman who went by the name E.T., a box of

---

[69] Ex. 10, Adv. Doc. No. 59-10 at 3 & 22.

[70] Ex. 10, Adv. Doc. No. 59-10 at 22.

[71] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 66, ll. 3 – 8.

[72] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 66, ll. 12 – 19.

[73] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 66, l. 20 – p. 67, l. 12.

[74] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 66, l. 20 – p. 67, l. 12.

documents to shred.[75] Later, Smith walked into the polishing room and saw the box

sitting on the floor.[76] Kicking the box with his foot, Smith told E.T. he needed him to

get on it that day.[77] Although it's unclear what documents were in the box, the

documents appeared to have come from Smith's office, where all the back-up

information for the borrowing base certificates was stored.[78]

### N.  Before Continental filed an Assignment for Benefit of Creditors, Continental's vendors remove consigned inventory from the store.

At the beginning of September, Keller noticed at least a 50% drop in

inventory.[79] Around that same time, multiple employees recall seeing Jimmy Picone

from Buxbaum Jewelry removing Buxbaum's inventory from the store.[80] After

Buxbaum removed his jewelry, employees recall that the store's inventory went down

significantly. In fact, one employee described the shelves as barren.[81]

---

[75] Trial Tr. Vol. I, Adv. Doc. No. 115, at p. 133, l. 17 – p. 135, l. 21; Trial Tr. Vol. III, Adv. Doc. No. 121, p. 502, l. 13 – p. 503, l. 15; Trial Tr. Vol. II, Adv. Doc. No. 120, at p. 465, ll. 16 – 24.

[76] Trial Tr. Vol. I, Adv. Doc. No. 115, at p. 135, ll. 8 –21.

[77] Trial Tr. Vol. I, Adv. Doc. No. 115, at p. 135, ll. 8 –21.

[78] Trial Tr. Vol. II, Adv. Doc. No. 120, at p. 465, l. 25 – p. 466, l. 9.

[79] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 467, l. 21 – p. 468, l. 18.

[80] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 292, l. 5 – p. 293, l. 7; Trial Tr. Vol III, Adv. Doc. No. 121, at p. 558, ll. 6 – 24; Ex. 136, Adv. Doc. No. 76-13, at p. 24 – 25 & 35; Ex. 160, Adv. Doc. No. 77-11, at p. 194, ll. 15 – 19; Ex. 266, Adv. Doc. No. 110-2, at p. 246, ll. 17 – 25.

[81] Ex. 266, Adv. Doc. No. 110-2, at p. 246, ll. 17 – 25.

O.    **After Continental files an Assignment for Benefit of Creditors, Webster discovers $4.9 million in inventory is missing.**

On September 9, 2011, Continental filed an Assignment for the Benefit of Creditors (ABC) naming Larry Hyman as the assignee of all the company's assets.[82] In its petition, Continental represented that it owned $6,525,099.35 in jewelry and that it had more than $702,845 in accounts receivable.[83] The inventory listed in the ABC petition was consistent with Continental's August 26, 2011 borrowing base certificate, in which it certified Continental had a little more than $6.6 million in eligible inventory and a little more than $775,000 in receivables.

The same day the petition was filed, Hyman went to Continental's showroom.[84] Hyman immediately knew there was no way there was $6 million in inventory in the store:

> [M]y first impression was that, per the schedules, it was supposed to be six-plus-million dollars of jewelry in the store. And I looked at the [jewelry] cases and I recall asking an employee, "Where is the rest of the inventory?" Because I remember remarking that, "Unless the Hope Diamond is here, there's no way there's $6 million worth of jewelry." And I was told that all the jewelry was on display and there's nothing in the safe. And there were some loose diamonds that were in another part of the store. So I thought there's definitely a difference in the

---

[82] Ex. 36, Adv. Doc. No. 61-3.

[83] Ex. 36, Adv. Doc. No. 61-3.

[84] Trial Tr. Vol. II, Adv. Doc. 120, at p. 409, l. 13 – p. 410, l. 1.

value that's being displayed, and which I'm being told was
the total inventory, versus what was scheduled.[85]

Three days later, Hyman's suspicion was confirmed. On September 12, 2011,

Hyman had one of his employees, Richard Onderko, conduct an inventory.[86]

Onderko's inventory, conducted with the help of Continental employees, went pretty

much like all the other inventories the company had done, though nobody from B2D

Semago was there.[87]

But there was one other difference: Onderko's inventory turned up only

$1,622,725 in inventory—*millions less* than reported in any previous borrowing base

certificate or collateral report and *$4.9 million less* than Continental represented in its

ABC petition.[88] Although Hyman was not surprised, Webster was shocked.[89]

### P.    Forensic accountants determined Smith falsely inflated Continental's inventory.

Because there was nearly $5 million in inventory missing, Hyman immediately

filed a claim with Continental's insurer.[90] Continental's insurer, in turn, hired

forensic accounting firm Cowheard Singer, who conducted an extensive investigation

---

[85] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 410, ll. 6 – 20.

[86] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 411, ll. 15 – 22.

[87] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 411, l. 23 – p. 413, l. 3; Trial Tr. Vol. I, Adv. Doc. No. 115, at p. 214, l. 10 – p. 215, l. 11.

[88] Ex. 129, Adv. Doc. No. 76-6; Trial Tr. Vol II, Adv. Doc. No. 120, at p. 413, ll. 4 – 8.

[89] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 233, ll. 7 – 17; Trial Tr. Vol II, Adv. Doc. No. 120, at p. 414, l. 9 – p. 415, l. 3; p. 453, ll. 11 – 18; Trial Tr. Vol. I, Adv. Doc. No. 115, at p. 122, ll. 11 – 17.

[90] Trial Tr. Vol. II, Adv. Doc. No. 120, at p. 445, l. 8 – p. 447, l. 3.

into the $5 million inventory discrepancy.[91] Based on its review of Continental's books and records, Cowheard Singer attributed the $5 million inventory discrepancy to (at least) two factors.[92]

First, Continental failed to properly record merchandise sales and returns. Cowheard Singer's investigation uncovered transactions where merchandise physically left Continental's premises, either because it was sold or because it was consigned jewelry returned to a vendor, but not removed from Syntonics.[93] Although the items were small dollar items, they comprised a significant number of transactions.[94]

Second, and more significant, Cowheard Singer found that a large percentage of the inventory in Syntonics was consigned—not owned.[95] Going through Continental's records, Cowheard Singer found source records (i.e., a purchase invoice or consignment memo) for a little more than $1.8 million in inventory, all of which had been entered into Syntonics as owned.[96] Of that $1.8 million in inventory, however, roughly $500,000 was owned and $1.3 million was consigned.[97] In other

---

[91] Exs. 31 & 32, Adv. Doc. Nos. 60-7 & 60-8.

[92] Ex. 31, Adv. Doc. No. 60-7, at 2 – 6; Ex. 32, Adv. Doc. No. 60-8, at 2.

[93] Ex. 31, Adv. Doc. No. 60-7, at 5; Ex. 32, Adv. Doc. No. 60-8, at 4.

[94] Ex. 31, Adv. Doc. No. 60-7, at 2 – 6; Ex. 32, Adv. Doc. No. 60-8, at 4.

[95] Ex. 31, Adv. Doc. No. 60-7, at 3 – 5; Ex. 32, Adv. Doc. No. 60-8, at 4 – 7.

[96] Ex. 31, Adv. Doc. No. 60-7, at 3 – 5; Ex. 32, Adv. Doc. No. 60-8, at 4 - 7.

[97] Ex. 31, Adv. Doc. No. 60-7, at 3 – 5; Ex. 32, Adv. Doc. No. 60-8, at 4 – 7.

words, around 72% of the inventory for which there was source records was improperly entered into Syntonics as owned.[98] Because Continental improperly recorded consigned jewelry as owned in Syntonics, Continental's borrowing base certificates (none of which indicated any consigned inventory) significantly overstated the company's inventory.[99]

### Q. Webster's own forensic accountant confirmed that Continental falsely inflated its inventory.

Webster decided to hire its own forensic accountant, Kapila & Company, to investigate the missing inventory.[100] Like Cowheard Singer, Kapila & Company investigated Continental's books and records, at least to the extent they existed.[101] And, for the most part, Kapila & Company's findings mirrored Cowheard Singer's findings: Among other reasons, the $4.9 million inventory discrepancy was attributable to Continental improperly recording consigned jewelry as owned and failing to remove sold or returned items from Syntonics.[102]

---

[98] Ex. 31, Adv. Doc. No. 60-7, at 3 – 5; Ex. 32, Adv. Doc. No. 60-8, at 4 – 7.

[99] Ex. 31, Adv. Doc. No. 60-7, at 3 – 5; Ex. 32, Adv. Doc. No. 60-8, at 4 – 7.

[100] Ex. 138, Adv. Doc. No. 76-15.

[101] Ex. 138, Adv. Doc. No. 76-15.

[102] Ex. 138, Adv. Doc. No. 76-15, at 8 – 12.

### R.    Webster suffers a $4 million loss on its loan.

At the time the ABC was filed, Webster was owed just under $5 million.[103] Only about $1.6 million in gross proceeds was realized from the sale of Continental's inventory as part of the ABC.[104] After applying the $1.6 million in sales proceeds, and after accounting for certain expenses Webster had to advance, Webster ended up being out $4,012,307.73 on its loan to Continental.[105]

## II.    CONCLUSIONS OF LAW

Webster filed this proceeding alleging that Smith fraudulently induced Webster into extending credit to Continental by intentionally misrepresenting the amount of Continental's inventory on the borrowing base certificates that Continental submitted to Webster.[106] Webster has also sought a determination that the debt that Smith owes Webster is nondischargeable under Bankruptcy Code § 523(a)(2)(B).[107]

Although Webster's claims are distinct, the elements necessary to prove them overlap to a significant extent. To prevail on its fraudulent misrepresentation claim, Webster must prove (1) Smith made a false statement about a material fact; (2) Smith

---

[103] Adv. Doc. No. 80 at 5; Trial Tr. Vol. I, Adv. Doc. No. 115, at p. 226, ll. 18 – 19.

[104] Trial Tr. Vol. I, Adv. Doc. No. 115, at p. 249, l. 22 – p. 250, l. 6.

[105] Trial Tr. Vol. I, Adv. Doc. No. 115, at p. 228, l. 7 – 11.

[106] Adv. Doc. No. 1 at ¶¶ 29 -35.

[107] Adv. Doc. No. 1 at ¶¶ 42 – 45.

knew the statement was false; (3) Smith intended Webster to rely on the false statement; and (4) Webster relied on the false statement to its detriment.[108]

To prevail on its § 523(a)(2)(B) claim, Webster must prove that (1) the debt was for an extension of credit; (2) Smith used a written statement to obtain the credit; (3) the statement was with respect to Continental's financial condition; (4) the written statement was false; (5) Smith intended to deceive Webster when he made the false written statement; and (6) Webster reasonably relied on the false statement.[109]

There's no dispute that Smith submitted written statements to Webster (i.e., the borrowing base certificates) and that Webster extended nearly $5 million in credit to Continental.[110] Thus, the Court need only decide whether the borrowing base certificates were false and, if so, whether Smith intended to deceive Webster and whether Webster, in fact, reasonably relied on the borrowing base certificates.

### A.    The borrowing base certificates were unquestionably false.

The evidence at trial was overwhelming that the borrowing base certificates were false. For starters, multiple Continental employees testified (in the form of sworn statements and deposition testimony) that Smith was the person who directed

---

[108] *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010).

[109] 11 U.S.C. § 523(a)(2)(B); *Sears v. United States*, 533 F. App'x. 941, 945 (11th Cir. 2013); *Appling v. Lamar, Archer & Cofrin, LLP*, 848 F.3d 953, 956-57 (11th Cir. 2017).

[110] Adv. Doc. No. 80 at 7 – 8.

how items should be entered into Syntonics;[111] that at least 70 – 80% of the time, Smith directed that consigned items should be entered into Syntonics as owned instead of consigned;[112] Continental employees were not permitted to remove items from inventory unless Smith directed them to do so;[113] and Smith often directed employees not to remove items from inventory even though the items had been sold or returned.[114]

That testimony was corroborated by two forensic accounts: Cowheard Singer and Kapila & Company.[115] Cowheard Singer's pre-trial investigation revealed that more than 70% of the inventory for which there was source documentation was improperly entered into Syntonics as owned instead of consigned.[116] Cowheard Singer likewise concluded that a significant number of small-dollar items remained in the system after they were sold or returned.[117] Kapila & Company likewise

---

[111] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 463, l. 15 – p. 464, l. 11; Trial Tr. Vol I, Adv. Doc. No. 115, at p. 163, ll. 3 – 24.

[112] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 163, ll. 3 – 24; Trial Tr. Vol III, Adv. Doc. No. 121, at p. 542, ll. 11 – 22.

[113] Trial Tr. Vol III, Adv. Doc. No. 121, at p. 542, l. 11 – p. 544, l. 25; p. 553, l. 10 – p. 554, l. 7.

[114] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 155, l. 13 – p. 156, l. 22; Trial Tr. Vol III, Adv. Doc. No. 121, at p. 542, l. 11 – p. 544, l. 25; p. 550, l. 18 – p. 554, l. 7.

[115] Ex. 31, Adv. Doc. No. 60-7, at 3 – 6; Ex. 32, Adv. Doc. No. 60-8, at 4 – 7; Ex. 138, Adv. Doc. No. 76-15, at 8 – 12.

[116] Ex. 31, Adv. Doc. No. 60-7, at 3 – 5; Ex. 32, Adv. Doc. No. 60-8, at 4 – 7.

[117] Ex. 31, Adv. Doc. No. 60-7, at 5; Ex. 32, Adv. Doc. No. 60-8, at 4.

concluded that Continental improperly entered consigned jewelry in Syntonics as owned and failed to remove sold or returned inventory from Syntonics.[118]

Melissa Davis, who conducted the pre-trial forensic investigation on behalf of Kapila & Company, testified as an expert witness at trial on behalf of Webster. Davis, a CPA and a Certified Fraud Examiner, has twenty years of accounting experience, including fifteen years in forensic accounting. Among the expert opinions Davis offered, the most important was that Syntonics—the source for the inventory included on the borrowing base certificates—did not contain accurate information as to the amount of inventory Continental owned.[119]

For one thing, Davis opined that Continental's inventory included returned items.[120] In fact, from Davis' review of Continental's books and records, it was her opinion that Continental's inventory included nearly $1 million in items that had been returned.[121] Worse, Davis opined that Continental improperly recorded consigned jewelry in Syntonics as owned.[122]

To reach that conclusion, Davis reviewed the source documents for Continental's alleged $6 million in inventory. Because Smith had at least some of

---

[118] Ex. 138, Adv. Doc. No. 76-15, at 8 – 12.

[119] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 271, ll.2 – 13.

[120] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 295, l. 19 – p. 296, l. 25.

[121] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 295, l. 19 – p. 303, l. 16.

[122] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 284, l. 22 – p. 285, l. 3.

those documents shredded, Davis was only provided source documentation for a little more than $1.8 million in inventory.[123] What Davis found from her review of that source documentation was consistent with what Continental's employees testified to and what Cowheard Singer concluded from its pre-trial forensic examination.

Of the $1.8 million in inventory for which Davis had source documentation, nearly $1.4 million of it was consigned.[124] That means that, at a minimum, the inventory included on the borrowing base certificates, which supposedly contained no consigned inventory, was overstated by $1.4 million.[125] But, given the testimony of Continental's employees, it's safe to assume that roughly 70 – 80% of *all* Continental's inventory was consigned.[126]

In fact, if you assume that 75% of all Continental's jewelry was consigned, that would have to mean that, rather than having the $6.5 million in inventory that Continental claimed in its ABC petition, Continental would have had roughly $1.6 million in inventory. That's basically the exact number Onderko came up with in his inventory—further corroborating the testimony that Smith directed the inventory

---

[123] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 284, l. 22 – p. 286, l. 21.

[124] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 289, l. 18 – p. 291, l. 10.

[125] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 291, ll. 20 – 24.

[126] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 291, l. 25 – p. 292, l. 3.

control manager to enter consigned jewelry into Syntonics as owned 70 – 80% of the time.

Although Smith doesn't have the burden of proof, he nonetheless is forced to offer an alternative explanation for the missing $4.9 million in inventory. His explanation? Smith offers two—one more conventional, the other more fanciful.

First the conventional explanation: Smith explains that Continental routinely bought merchandise "on memo." Although items bought "on memo" were often thought of as being synonymous with "consigned" merchandise, as Smith explains it, bringing in an item "on memo" was like buying it on terms. In fact, when he brought goods in "on memo," Smith would often issue the vendor a postdated check as payment. According to Smith, Webster's own expert (Davis) said this practice was not "problematic."

If this were all true, it would explain away the testimony that Smith directed Continental employees to enter consigned jewelry into Syntonics as owned 70 – 80% of the time. After all, if merchandise that came in "on memo" really had been purchased on terms, then of course it would be entered into Syntonics as owned.

But there are two problems with Smith's explanation. While it's true that Davis opined that there would be nothing wrong with the process Smith described, she conditioned that opinion on Continental recording a corresponding account payable for each purchase.[127] The evidence is overwhelming that more than $4.5

---

[127] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 293, l. 22 – p. 294, l. 10.

million in inventory was consigned or "on memo," which means, if what Smith says
is true, there should have been at least $4.5 million in accounts payable on
Continental's books. But there wasn't: Continental's audited financials only showed,
on average, roughly $1 million in payables at any given time, which is entirely
inconsistent with Smith's explanation.[128]

But there's an even bigger problem with Smith's explanation: if Continental
truly owned the items that came in "on memo," what happened to the missing $4.9
million in inventory? This is where Smith is forced to weave a more fanciful
explanation.

At trial, Smith alluded to several dots he hopes the Court will connect:
Continental's annual revenues routinely exceeded $5 million; a jewelry store couldn't
generate $5 million in revenue on $1.6 million in inventory; according to Webster's
expert, the loss of inventory was caused by an abrupt event; the person who
conducted the inventory (Onderko) had been accused of fraud in the past; and after
Continental closed down, former Continental employees opened up a new store
using a similar name. When the Court connects those dots, Smith hopes the Court
sees a particular picture: All along Continental had anywhere from $4 million to $6.6
million, as certified on the borrowing base certificates, only to have three quarters of
the inventory stolen sometime after Smith walked away—either by a (supposed)

---

[128] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 295, ll. 12 – 18.

crook working for Hyman or former employees who were starting up a new jewelry store.

The problem is that when the Court connects the dots Smith alludes to, it sees a different—more plausible—picture: Continental only had $1.6 million in inventory. So, to keep the company from going under, Smith augmented his inventory by bringing jewelry in on consignment. But, rather than entering the jewelry into Syntonics as consigned, Smith directed it to be entered as owned so he could increase his borrowing base and therefore supplement his cash flow. He then submitted false borrowing base certificates to Webster so Continental could draw on the line of credit. But, as is always the case, you can only rob Peter to pay Paul for so long. As the company was on the verge of going under, vendors who consigned merchandise to Continental, such as Buxbaum, removed their merchandise from the store, leaving the store barren. The Court concludes that is what happened.

### B.    Smith intended to deceive Webster.

When it comes to fraudulent intent, direct evidence is rarely available.[129] Courts, therefore, may infer an intent to deceive from the totality of the circumstances.[130] Here, based on the totality of circumstances, the Court can easily infer that Smith intended to deceive Webster by submitting false borrowing base certificates.

---

[129] *In re Cram*, 178 B.R. 537, 540 (Bankr. M.D. Fla. 1995).

[130] *Id.*

To begin with, Smith had a financial incentive to do so. Beginning in late 2007, Continental found itself in a Catch-22: As Continental's revenues plummeted from $8.3 million to $5.5 million, Continental needed to borrow against the line of credit more and more.[131] But the only legitimate way to increase availability on the line of credit was for Continental to increase its inventory, which Continental didn't have the cash for.[132] Falsifying the borrowing base certificates by including consigned jewelry as owned, not to mention failing to remove inventory after it was sold or returned, allowed Continental to inflate its eligible inventory and therefore increase the availability on the line of credit.

What's more, employees believed Smith was falsifying the borrowing base certificates to increase availability on the line of credit.[133] Those employees, however, were afraid to say anything at the time for fear of losing their jobs.[134]

Finally, Smith destroyed the records that would have revealed the extent to which consigned jewelry was entered into Syntonics as owned.[135] Smith denies that he shredded any relevant documents. But the evidence at trial showed that Smith

---

[131] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 113, l. 18 – p. 114, l. 25.

[132] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 47, ll. 3 – 8; Trial Tr. Vol II, Adv. Doc. No. 120, at p. 472, l. 19 – p. 473, l. 10.

[133] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 131, l. 17 – p. 132, l. 9.

[134] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 166, l. 8 – p. 167, l. 14; Trial Tr. Vol. III, at Adv. Doc. 121, at p. 553, l. 23 – p. 554, l. 7.

[135] Trial Tr. Vol. I, Adv. Doc. No. 115, at p. 133, l. 17 – p. 135, l. 21; Trial Tr. Vol. III, Adv. Doc. No. 121, p. 502, l. 13 – p. 503, l. 15; Trial Tr. Vol. II, Adv. Doc. No. 120, at p. 465, ll. 16 – 24.

kept the source documents for the Syntonics inventory in his office;[136] employees saw Smith give Continental's polisher documents to shred;[137] and Webster's expert (and the insurance company's forensic accountant) were given source documents for only about 30% of Continental's alleged $6.5 million in inventory.[138] Surely that's not a coincidence.

### C.   Webster relied to its detriment on the false borrowing base certificates.

It's worth noting at the outset that the reliance element is different for Webster's fraudulent misrepresentation claim than it is for its nondischargeability claim under § 523(a)(2)(B). A decade ago, in *Butler v. Yusem*, the Florida Supreme Court observed that *justifiable* reliance is not an element of fraudulent misrepresentation.[139] So, to prevail on its fraudulent misrepresentation claim, Webster need not prove that its reliance on the borrowing base certificates was reasonable.

---

[136] Trial Tr. Vol. II, Adv. Doc. No. 120, at p. 465, l. 25 – p. 466, l. 9.

[137] Trial Tr. Vol. I, Adv. Doc. No. 115, at p. 133, l. 17 – p. 135, l. 21; Trial Tr. Vol. III, Adv. Doc. No. 121, p. 502, l. 13 – p. 503, l. 15; Trial Tr. Vol. II, Adv. Doc. No. 120, at p. 465, ll. 16 – 24.

[138] Trial Tr. Vol II, Adv. Doc. No. 120, at p. 284, l. 22 – p. 286, l. 21.

[139] *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010).

The same is not true, however, under § 523(a)(2)(B). Under § 523(a)(2)(B),
Webster must show that it actually relied on Smith's false statements and that its
reliance was reasonable.[140]

There's really no question, as a factual matter, that Webster actually relied on
the borrowing base certificates. Because the line of credit was an asset-based loan,
Webster required that any funding advance be accompanied by a borrowing base
certificate certifying the amount of Continental's eligible inventory and calculating
the amount of available credit.[141] Significantly, each borrowing base certificate
required Continental to represent and warrant that the information in the borrowing
base certificate was true.[142] Besides, a former Webster employee who was responsible
for the loan specifically testified Webster relied on the borrowing base certificates.[143]

The only real question is whether Webster's reliance was reasonable. To
determine whether it was, Smith proposes the Court consider whether (1) Webster
followed its established lending practices; (2) Webster verified Continental's
borrowing base certificates using outside sources; (3) even a minimal investigation

---

[140] *Hurston v. Anzo (In re Anzo)*, 562 B.R. 819, 829 (Bankr. N.D. GA 2016); *Mountain Valley Cmty. Bank v. Freeman (In re Freeman)*, 469 B.R. 128, 131 (Bankr. M.D. Ga. 2012).

[141] Ex. 38, Adv. Doc. No. 61-5, at § 2.1; Ex. 50, Adv. Doc. No. 61-17; Trial Tr. Vol I, Adv. Doc. No. 115, at p. 41, l. 20 – p. 43, l. 11.

[142] Ex. 50, Adv. Doc. No. 61-17.

[143] Trial Tr. Vol I, Adv. Doc. No. 115, at p. 58, ll. 9 – 15.

would have revealed Smith's representations were false; and (4) there were any "red flags" that should have alerted Webster that Smith's representations were false.[144]

The first two factors unquestionably weigh in favor of finding that Webster's reliance was reasonable. Smith doesn't dispute that Webster followed its established lending practices in administering the line of credit. And Webster had third parties monitor its collateral: ARG Recovery, for instance, tested Continental's collateral reporting,[145] while B2D Semago audited Continental's financial statements and observed part of Continental's year-end inventory.[146] It's the last two factors—particularly the existence of "red flags"—that Smith homes in on.

As evidence of a "red flag," Smith points out that Spain Price noted in its field examination reports that vendors had submitted invoices with consignment language to Continental:

> It was noted during review of invoices that some are submitted by vendors for received product with consignment language. This has been noted in the past and appears to continue through this review. A copy of the language, as taken from a selection of invoices is included as an exhibit at the end of the report. Management indicated that although invoices are noted with consignment language in some cases the company recognizes these as asset purchases not subject to consignment terms. All purchases are treated in this manner. The lender should determine legal ownership of

---

[144]

[145]

[146]

> this inventory and their rights to access it under adverse
> circumstances.[147]

Based on this language, Smith concludes that Webster must have known of any consignment issues.

And, given Webster's failure to take any action, Smith says Webster must have concluded that the consignment issues were not material or that it was satisfied that its interests were protected despite any consignment issues.

As a purely factual matter, it appears Webster did take some action in response to the Spain Price report. Webster says it would have talked to Smith about the importance of not including consigned jewelry in the stock ledger.[148] And it says it would have also run an updated UCC search to make sure no vendors were filing liens ahead of Webster.[149] It appears, from the evidence introduced at trial, that Webster did run an updated UCC search.[150] But was Webster required to do more?

The Court concludes that the Spain Price report would not have put Webster on inquiry notice that Continental's borrowing base certificates were false—much less that they had overstated Webster's collateral by nearly $5 million. In fact, when read in its entirety, the Spain Price report minimizes the scope of any potential consignment issues.

---

[147] Ex. 11, Adv. Doc. No. 59-11, at 3.

[148] Trial Tr. Vol I., Adv. Doc. No. 115, at p. 97, l. 3 – p. 98, l. 24.

[149] Trial Tr. Vol I., Adv. Doc. No. 115, at p. 97, l. 3 – p. 98, l. 24.

[150] Ex. 168, Adv. Doc. No. 77-19; Trial Tr. Vol. I, Adv. Doc. No. 115, at p. 93, l. 10 – p. 94, l. 23.

As a starting point, the Spain Price report notes that Continental's management indicated that the company did not regularly carry consigned merchandise.[151] Rather, consignment was generally restricted to special limited programs, event sales, or, as was most often the case, special orders by customers.[152] Moreover, Spain Price only located one vendor (SN Asia) who had recorded a UCC-1, which would be used to perfect the vendor's security interest in the consigned jewelry.[153] At the time, that vendor was owed roughly $35,000 total, though Smith later told Webster that the balance had been reduced to zero.[154] Finally, the Spain Price report noted that consigned jewelry was not included on the stock ledger report.[155]

Keep in mind, too, that the Spain Price report cannot be read in a vacuum. For years, ARG Recovery and B2D Semago were monitoring Webster's collateral. In fact, B2D Semago observed at least part of Continental's year-end inventory and was supposed to be auditing financial statements. And neither ARG Recovery nor B2D Semago raised any red flags about consignment issues.

---

[151] Ex. 11, Adv. Doc. No. 59-11, at 3.

[152] Ex. 11, Adv. Doc. No. 59-11, at 3.

[153] Ex. 11, Adv. Doc. No. 59-11, at 3, 13 & 24 – 25.

[154] Ex. 168, Adv. Doc. No. 77-19

[155] Ex. 11, Adv. Doc. No. 59-11, at 9.

Whether reliance is reasonable must be determined on a case-by-case basis considering the totality of circumstances.[156] Considering the totality of circumstances here, the Court concludes that Webster's reliance on the borrowing base certificates was reasonable even though the Spain Price report raised a potential consignment issue.

## III.  CONCLUSION

This Court was faced with competing explanations for nearly $5 million in missing jewelry. On the one hand, Smith suggests that, over the years, Continental bought millions of dollars of inventory only to have three quarters of the inventory stolen after Smith walked away from the business. On the other hand, Webster suggests that Smith falsely inflated Continental's borrowing base by improperly including consigned jewelry in Syntonics as owned and failing to remove inventory once it was sold or returned.

Only Webster's explanation was supported by the evidence at trial. Multiple Continental employees testified that, to increase the availability on the line of credit, Smith falsely inflated Continental's inventory. That testimony was corroborated by multiple forensic examinations, expert testimony, and common sense. The Court therefore concludes that Smith is liable to Webster for fraudulent misrepresentation and that the debt is nondischargeable under Bankruptcy Code § 523(a)(2)(B). The Court will enter a separate judgment in favor of Webster.

---

[156] *In re McDowell*, 497 B.R. 363, 370 (Bankr. N.D. Georgia 2013).

Attorney Scott Underwood is directed to serve a copy of these Findings of Fact and Conclusions of Law on interested parties who do not receive service by CM/ECF and file a proof of service within three days of entry.

**Scott A. Underwood, Esq.**
**Blake J. Delaney, Esq.**
**Victoria Oguntoye, Esq.**
**Buchanan Ingersoll & Rooney, P.C.**
*Counsel for Webster Business Credit Corporation*

**Alberto G. Gomez, Esq.**
**Johnson Pope Bokor Ruppel & Burns, LLP**
*Counsel for Donald Woodrow Smith*